George James WILLIAMS, Duralph S. Hayes and Ernest W. Turner, Jr., Individually and on behalf of all others similarly situated,

v.

NEW ORLEANS STEAMSHIP ASSOCIATION, Abingdon Steamship Corp., Riverside Stevedore, Inc., Atlantic & Gulf Stevedores, Inc., Ayers Steamship Company, Inc., Cooper Stevedoring of Louisiana, Inc., Dalton Steamship Corp., Delta Steamship Lines, Inc., Gulf Motorships, Inc., Hansen and Tidemann, Inc., Gulf Stevedore Corp., Edmond Loeliger, Inc., Lykes Brothers Steamship Co., Inc., New Orleans Stevedoring Company, Norton, Lilly and Company, Inc., Dixie Stevedores, Inc., Rogers Terminal and Shipping Corp., Ryan Stevedoring Company, Inc., T. Smith & Son, Inc., Southern Stevedoring Company, Inc., States Marine-Isthrainian Agency, Inc., Strachan Shipping Company, Texas Transport and Terminal Company, Inc., J. P. Florio and Company, Inc., Texla Stevedores, Inc., United Fruit Company, Inc., United States Stevedore Corp., Waterman Steamship Corp., International Longshoremen Association, Local 1418 General Longshore Workers, I.L.A., 1419 General Longshore Workers, I.L.A., Local 1802 Sacksewers, Sweepers, Waterboys and Coopers, I.L.A., Local 1683 Sacksewers, Sweepers, Waterboys and Coopers, I.L.A., and Pelican Stevedoring Company, Inc.

Civ. A. No. 71–873.

United States District Court,
E. D. Louisiana,
Section B.

Feb. 14, 1979.

George M. Strickler, Jr., New Orleans, La., Richard B. Sobol, Sobol & Trister, Richard T. Seymour, Washington, D. C., for plaintiffs.

Andrew P. Carter, David E. Walker, Monroe & Lemann, New Orleans, La., for New Orleans S. S. Ass'n and others.

Seymour M. Waldman, New York City, for Intern. Longshoremen's Ass'n.

Victor H. Hess, Jr., Jackson & Hess, New Orleans, La., for Locals 1419, 1683 and 1802.

Alvin J. Liska, New Orleans, La., for Local 1418.

HEEBE, Chief Judge:

Plaintiffs, George James Williams, Duralph S. Hayes and Ernest W. Turner, Jr., individually and on behalf of all others similarly situated, filed this suit against the New Orleans Steamship Association (NOSA) and twenty-nine of its member corporations, shipping, stevedoring and freight-handling companies operating in the Port of New Orleans, along with the International Longshoremen Association, Locals 1418 and 1419 General Longshore Workers, I.L.A., and Locals 1802 and 1683, Sacksewers, Sweepers, Waterboys and Coopers, I.L.A. Subsequently, Matthew D. Richard and John T. Aaron were permitted to intervene as plaintiffs, and three additional defendants, Louisiana Stevedores, Inc., Mid-Gulf Stevedores, Inc., and J. Young & Company, were joined. Plaintiffs alleged that the member companies of NOSA discriminated against them and members of the class they represent on the basis of race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a). The allegations against the defendant Locals 1418 and 1419 of the General Longshore Workers, I.L.A., is that they are segregated by race, Local 1418 being virtually all white and Local 1419 all black. The same is allegedly true with respect to Locals 1802 and 1683, the former being all white and the latter all black. It was specifically alleged that plaintiffs are affected by this segregation of the local unions because it provides one method by which preference in job assignment is given to white employees. The plaintiffs further alleged that the segregated locals had negotiated with NOSA for labor contract provisions which were inherently racially discriminatory. Plaintiffs seek a permanent injunction prohibiting NOSA and its member companies from violating 42 U.S.C. § 2000e–2. They also seek the issuance of a permanent injunction requiring defendant International Longshoremen Association and defendant locals to merge Locals 1683 and 1802 into one local and, also, Locals 1418 and 1419 into one local, with no further classification and segregation of membership on the basis of race.

An investigation, which resulted in a Report and Findings of the Department of Labor, dated July 1964, was conducted by the U. S. Department of Labor into the areas of manpower utilization and job security in the longshore industry in the Port of New Orleans. This study did not focus on the question of race. The study did reveal that historically employment in the longshore industry was on a casual and irregular basis. This was produced by a large surplus of labor in the longshore industry in New Orleans which, in turn, resulted in a total lack of job security in the Port. The figures which the study arrived at indicated that general cargo tonnage in the port of New Orleans, during the preceding seven-year period, ranged from a high of approximately 5.3 million tons in 1957 to a low of approximately 3.9 million tons in 1959. However, it was determined that the total number of hours worked annually by longshore employees during that seven-year period declined steadily. In the year 1962-63, total hours of employment had decreased by 27% below the 1956–57 work year. During that period, between 11,500 and 15,500 men were employed annually as longshore workers. However, the number of men hired on a weekly basis most frequently ranged between 6,000 and 6,200 employees, with a rare week providing work for 7,000 men. The obvious conclusion was that the total number of men in the workforce was almost double the num-

ber of jobs available in a normal workweek in the Port. There was no doubt that there existed an urgent need for the parties in New Orleans to develop a more stabilized workforce. The Report also noted that there was no seniority system in the Port of New Orleans and no formal attachment of men to companies that employed them. The only attachment was of men to. the foreman who hired them into a gang and, therefore, they worked for their foreman and not for the company. (NOSA Exhibit # 13, "Report and Findings of the Department of Labor, dated July 1964.") Due in large part to this Department of Labor study, a registration system was instituted which progressively stabilized employment in the Port.

The present nature and description of the resulting employment situation in the Port, which encompasses decasualization and institution of an employee registration system, is one agreed upon by all the parties, as evidenced by their Pre-trial Order. (Record, Document # 171.) Waterfront workers now employed in the Port of New Orleans are separated into various crafts and work under the jurisdiction of separate I.L.A. local unions. As stated above, this suit involves two of these crafts which are worked by waterfront workers: general longshoremen, working under the jurisdiction of Locals 1418 and 1419; sacksewers, sweepers, waterboys and coopers, working under the jurisdiction of Locals 1802 and 1683. At present, both of the above workforces are divided into categories consisting of: "*eligible employees*," those who are eligible to participate in a "Guaranteed Annual Income" Plan (set out in Article XXVIII of NOSA's contract with the Locals) and who have first priority for employment as Category 1 employees and are issued cards known as "G Cards"; next, *"G–O" men*, Category 2, who are not covered by the "Guaranteed Annual Income" Plan but who have the same priority for employment as Category 1 men and are issued "G–O Cards"; third, *"SG" men*, who have a secondary priority for employment below the first two, are issued "SG Cards" and constitute Category 3; finally, *casuals*, made up of a constantly changing group of individuals, the great majority of whom apply for longshore work sporadically and who have no longshore identification cards. The first three categories described make up the "registered workforce," casuals not being among those registered. The foregoing is the classification system for longshoremen. The sacksewers, sweepers, waterboys and coopers are similarly classified in their workforce, the difference in terminology being of no importance as there exists the same types of categories with the same types of priority.

Locals 1418 and 1419, together, and Locals 1683 and 1802, together, each enter into a single collective bargaining contract with NOSA, which represents most of the employers of waterfront labor in the Port of New Orleans. Local 1418 has an active membership of approximately 750, 744 of whom are white. Local 1419 has an active membership of approximately 3,608, of whom all are black. Local 1802 has an active membership of approximately 117, all of whom are white, and Local 1683 has an active membership of approximately 91, all of whom are black.

General longshore workers load and unload ships, among other duties. Hiring of all longshoremen by the various stevedores takes place now, and did in the past, in one central hall, the Waterfront Employment Center owned by NOSA. Longshoremen are organized into "gangs" for ship loading and unloading work, each gang being supervised by a foreman. The size of a gang depends on the type of cargo to be worked, with the minimum gang size being specified in NOSA's Agreement with Locals 1418 and 1419. Under the current Agreement, general cargo gangs must be at least 16 men; grain gangs which work bulk grain need a minimum of 8 men; other specialized gangs range in size from 6—with bulk ore—to 18—on LASH ship work; carpentry gangs are of no specified size. All pay rates for longshoremen are set out in the Deep Sea Agreement between NOSA and Locals 1418 and 1419 and vary under certain contractually designated circumstances. Longshore

work is performed on a day-by-day basis, 7 days a week, with hiring done by the stevedoring companies at "shape ups" conducted twice a day at the Center, once in the morning and once in the afternoon. Some stevedoring companies use "regular" gangs to which they give preference on available work over non-regular gangs that may work for them from time to time. The company supervisor picks the foremen he wants to work for him, and the foremen hire their gangs. In a regular gang, the foreman is obliged to hire available regular members of his gang for required available work before anyone else. If a company has more work than can be done on a particular day by its regular gangs, it may then hire non-regular gangs, which may be a gang that is regular with another company which has no work for it at that time. It may also be a gang which is assembled by a longshoreman who also works as a foremen when such work is available. The foremen and longshore gangs are assigned to ships by a company supervisor and then to individual hatches on the ship by a ship superintendent, also an employee of the company who is in overall charge of the work being done on the vessel for the company. With respect to the other unions, the waterboys are those workers who provide drinking water for a gang, some waterboys being regular with a company and attached to its regular gangs and others non-regular, the latter being generally hired in the same manner as non-regular longshoremen. Not every gang carries a single waterboy, as frequently two waterboys will service three gangs working a single ship. The hiring supervisor normally designates which foreman will be allowed to hire a waterboy.

In addition to the individual claims made by plaintiffs and plaintiffs-intervenors, the following are the "class claims," many of which purportedly encompass claims made by the individuals: (1) racial discrimination in employment of foremen in that various companies discriminate against black longshoremen in hiring regular foremen, in the hiring of non-regular foremen and in allotting less work to regular and/or non-regular black foremen than to white foremen;

(2) racial discrimination against black longshoremen in the Waterboy-Sacksewer craft in the hiring of regular waterboys by major company-defendants and in allotting less work to them than to white waterboys; (3) racial discrimination in job assignment with general cargo gangs in that major company-defendants discriminate against black longshoremen by assigning a disproportionate number of them to hold work, while a disproportionate number of white longshoremen are assigned to non-hold work; (4) racial discrimination in that various companies employ a disproportionately small number of black longshoremen for grain gangs; (5) racial discrimination against black longshoremen by employing a disproportionately small number of them in carpentry gangs; (6) racial discrimination in that various companies assigned a disproportionate amount of the most arduous and unpleasant work to all-black general cargo gangs; (7) racial discrimination in overall allotment of work to black longshoremen in that various companies assign a disproportionately small amount of their work to black longshoremen; (8) racial discrimination in that various companies exclude black longshoremen from employment as superintendents; (9) racial discrimination in employment on LASH gangs against black longshoremen by assigning to them a disproportionately small amount of such work. Of course, the final allegation of discrimination is against the I.L.A. and the defendant Locals as to black longshoremen, as a class, by maintaining dual, segregated locals.

The question first posed to this Court has been defined by plaintiffs as being not whether improvements have occurred in the Port of New Orleans for black longshoremen or whether some blacks have advanced, but whether vestiges and traditions of racial discrimination, which existed in years past, continue to taint waterfront employment practices. Plaintiffs no longer assert all of the separate claims of racial discrimination which they asserted in their Pre-trial Order and at trial. This is most true with respect to discrimination by defendant companies against blacks in longshore and craft

2 work. We think they could hardly assert that such discrimination *was* proved at trial. The racial composition of the "G" workforce as of June 10, 1974, was 2,078 black and 682 white, i. e., 75.3% black and 24.7% white. All parties agree that there has been a long-standing three-fourths majority of blacks among longshoremen. In the contract year 1969/70, there were more workers and blacks constituted slightly less than three fourths of the workforce—2,854 black longshoremen were registered under the NOSA/ILA Deep Sea Agreement and 994 white, for a percentage of 74.16 black and 25.83 white. In addition to the increase in the percentage of black longshoremen between 1969/70 and 1974, the distribution of longshore hours worked by black "G" longshoremen in the contract year of 1972/73 was 76.1% for blacks and 23.9% for whites. This translates into average annual income as follows:

COMPARISON OF HIGHEST EARNING
"G" LONGSHOREMEN BY RACE
Contract Year 1972/73
(from NOSA Exs. # 46–50)

|  | Race/ | Average/ Hours | Average/ Earnings | Average/ Rate |
|---|---|---|---|---|
| 100 Highest | Black | 2,474.46 | $19,369.48 | $7.50 |
|  | White | 2,318.03 | 17,140.10 | $7.51 |
| 200 Highest | Black | 2,298.46 | 17,117.55 | 7.28 |
|  | White | 2,097.41 | 15,051.64 | 7.24 |
| 300 Highest | Black | 2,193.71 | 15,935.24 | 7.15 |
|  | White | 1,939.58 | 13,687.52 | 7.11 |
| 400 Highest | Black | 2,123.70 | 15,154.17 | 7.05 |
|  | White | 1,815.90 | 12,654.09 | 7.01 |
| 500 Highest | Black | 2,062.98 | 14,561.67 | 6.99 |
|  | White | 1,700.76 | 11,722.21 | 6.90 |
| 600 Highest | Black | 1,968.67 | 13,672.46 | 6.90 |
|  | White | 1,357.10 | 9,299.09 | 6.48 |

In considering the above chart, it should be kept in mind that there is a direct correlation between earnings and absenteeism, some individuals with a greater percentage of availability for work have earned slightly less than some employees with somewhat less hours worked, apparently due to the hourly rate for the type of work performed. The plaintiffs have now narrowed their allegations of racial discrimination by the defendant-companies to the following: (1) racial discrimination in preferred work assignments, i. e., longshoremen assigned to grain cargo, waterboys for grain cargo crews, carpentry work and assignments to LASH vessels and deck jobs in "integrated" general cargo crews; (2) racial discrimination in the selection and assignment of supervisors, i. e., superintendents and foremen (regular, extra, and grain). Plaintiffs attribute virtually all of the overall wage, hour and rate differences which they allege is suffered by blacks in the workforce to discrimination in the allocation of grain cargo work. These are, of course, in addition to the charges of illegal maintenance of racial segregation of local unions and discrimination against individual plaintiffs and plaintiff-intervenors.

In addition to the described narrowing of the area of alleged discrimination to class discrimination in grain and other premium work, plaintiffs have reduced the original twenty-seven defendant-stevedoring companies on the New Orleans waterfront to the following fifteen, which allegedly discriminate against blacks in the defined manner: (1) Atlantic and Gulf Stevedores,

Inc.; (2) Cooper Stevedoring of Louisiana, Inc.; (3) Dixie Stevedores, Inc.; (4) J. P. Florio & Company, Inc.; (5) Gulf Stevedore Corporation; (6) Louisiana Stevedores, Inc.; (7) Lykes Bros. Steamship Co., Inc.; (8) Mid-Gulf Stevedores, Inc.; (9) New Orleans Stevedoring Company; (10) Rogers Terminal and Shipping Corporation; (11) Ryan Stevedoring Company, Inc.; (12) T. Smith & Son, Inc.; (13) Strachan Shipping Company; (14) J. Young & Company, Inc.; (15) Southern Stevedoring Company. In order to prove their case, plaintiffs have undertaken the task of showing that each of these defendants discriminate in some particular though not necessarily identical way and that this individual discrimination then relates back to overall discrimination in the industry. This is somewhat of a departure from the position which plaintiffs took much earlier in the development of this suit when this Court was persuaded by them that all of the companies that were members of NOSA should be treated as "integral parts of a conglomerate employer." Twelve of the named defendants filed a motion to dismiss for lack of jurisdiction on the basis that Title VII of the Civil Rights Act, 42 U.S.C. § 2000e–2(a), was inapplicable to them as § 2000e defined *employer* as one with 25 or more employees for each working day. (Record, Documents Nos. 17 and 26 [p.2].) They had filed affidavits to the effect that they employed less than that number. In defining NOSA as an integrated enterprise the plaintiffs pointed out that for employment purposes, the members of NOSA operated as one large employer which controlled employment on the waterfront and established uniform employment practices applicable to all member companies. They further made the observation that NOSA was the collective bargaining agent for all of these companies operating in the Port of New Orleans and, as such, *established uniform employment policies applicable to all member companies* which delegated this broad authority to it. In view of this position, the Court will consider whether its agreement with plaintiffs' earlier position on the issue of membership-employer identity should also apply to its de-termination of the issue of discrimination. The Court also points out, as did plaintiffs, that its findings and conclusions at this stage deal only with issues of liability and do not attempt to consider any possible remedies that may be necessitated by its decision herein.

## Racial Discrimination as to Individual Plaintiffs

■ Plaintiff, George Williams, filed a charge of racial discrimination in employment against all defendants with the EEOC and, subsequently, received a notification of his right to institute suit in view of the inability of the EEOC to resolve the issue. This suit was filed on March 30, 1971. Williams filed a second charge with the EEOC against the defendants alleging retaliation against him on account of the filing of suit. The Commission authorized him to sue on this charge on February 7, 1973. Williams is a black longshoreman who started work in the Port of New Orleans in 1956 as a longshoreman in general cargo gangs. He became a member of Local 1419 in that same year, i. e., 1956. In June of 1965, Williams organized a general longshore gang and began attempting to get work as a foreman. He was never a regular foreman with any stevedoring company between the time he organized the gang in 1965 and the date he retired from the riverfront on November 30, 1971. In November of 1971, Williams developed an ulcer which rendered him physically unable to do longshore work and he retired on a pension. The Court does not feel that Williams carried his burden of proving that he did not become a regular foreman because of racial discrimination or that he received less work than whites as an "extra" foreman because of his race. There is no question in the Court's mind that Williams "hustled" as much as possible for foreman work, according to his own testimony and also by the fact that he did receive more than a modicum of such work. However, this Court concludes that the weight of the credible evidence indicates that Williams' failure to become a regular foreman was attributable

to his poor or inadequate performance, based on a productivity and accident record which were consistently unacceptable to the defendant employers.

There is evidence in the record that quite a few of the defendant companies gave Williams a chance to work as a foreman. Strachan Shipping hired Williams approximately ten times as a foreman in 1969, and about four times in 1970. In 1969, he was warned of poor production on the job, and it was concluded that there was no improvement in 1970. At his request, he was given one other chance to work as a foreman in that year. This time he refused to follow advice given by the superintendent at Strachan, his work was found lacking and he ceased working for the company in 1970.

This problem of poor performance proved to be the same reason Williams did not receive more work from other defendant companies. He worked as a foreman off and on from 1969 to 1971 for Louisiana Stevedores, but the evidence indicates that he was inept and unconscientious about supervising his men. After one bad experience, Louisiana refused to hire him again. Williams also worked for United States Stevedores between 1965 and 1971 as a nonregular foreman. The criticism of him by this company was specific with respect to the fact that he was often not around and his gang often worked without adequate supervision because of his absence. In addition, he was not considered a good foreman there because of lack of control over his gang. Williams also worked sporadically for Lykes Brothers prior to February of 1970. At this time, Williams' gang experienced an accident while working one of Lykes' vessels. The accident was the result of improper rigging. There is much disputing evidence as to who was at fault for the dangerous manner of rigging. The daily work report for the day in question does indicate that Williams' gang rigged the hatch where the accident took place. Regardless of who was actually at fault, there is no question but that the company believed that a foreman of a gang was responsible for the rigging of a hatch and that Williams was responsible for the accident.

As a result, instructions were given that he and his gang were not to be hired again *after* completion of work in that hatch, as contractually required. With respect to the six companies that Williams accused of not hiring him on racial grounds, the Court finds that all of them either by first-hand experience or by reputation were of the opinion that Williams' work showed poor performance.

■ We turn to plaintiff Duralph S. Hayes, a black waterfront worker and member of Local 1683, who filed a charge of racial discrimination against defendants T. Smith & Son, Inc., and Local 1802 on November 25, 1968, and received his "right to sue" letter from the EEOC on March 1, 1971. Hayes started work in the Port as a waterboy in July 1960 and became a member of Local 1683 shortly thereafter. Hayes has alleged that from the early part of 1968, he was one of defendant T. Smith's four regular waterboys on the night shift. However, at the time of trial, Hayes was a cooper, one who repairs damaged cargo and does other work on the wharf, at United Brands. At the time in question, Hayes and three white waterboys were the regular night help. The three agreed among themselves to divide the work up so that all would get an equal amount of it as all four would not be sent out at the same time. There is some conflict, but the Court is of the opinion that this arrangement ended when one white waterboy refused to continue to participate in it. Hayes alleges that after this, The T. Smith superintendent showed preference for a white waterboy, one Hingle, and this constituted the racial discrimination. However, the evidence shows that for the second, third and fourth quarters of 1968, Hayes earned more or slightly less than Hingle in each period. Plaintiff Hayes has not carried his burden of proving discriminatory practices on the part of T. Smith. The Court can only conclude that he left T. Smith to begin working for United Brands as a cooper.

■ The third plaintiff, Ernest Turner, filed a charge of racial discrimination

against defendant NOSA and all of its member companies on March 19, 1968, and received a "right to sue" letter from the EEOC on March 17, 1971. His chief reason for filing a charge against his "employer" was based on discrimination in hiring of black waterboys, most of whom were hired as extras. He correlates this discrimination to the method of hiring waterboys which denies him an equal amount of time, i. e., the waterboys are hired by a foreman and black foremen are given less opportunity to hire their waterboys. The issue of discrimination appears to revolve around Turner's contention that he was a regular waterboy. Turner filed his charge against New Orleans Stevedores, with whom, it is alleged by him, he started working regularly as a waterboy in June or July of 1968. The evidence predominates that Turner, contrary to his belief, was not a regular waterboy for New Orleans Stevedores. At the time complained of, New Orleans had only four regular waterboys, two black and two white, and Turner was not one of them. One Charlie Roy, a black foreman with New Orleans did carry Turner as a waterboy but, as he testified, only as an *extra*. He further stated that most of the time when he needed Turner he could not find him. Turner subsequently told him that he was working as a regular waterboy for T. Smith. This appears to be the situation as it existed, and there are, therefore, no real grounds against New Orleans Stevedores which, at least, have been proven by Turner.

█ The plaintiff-intervenors are Matthew D. Richard and John T. Aaron, black longshoremen on the New Orleans waterfront who are members of Local 1419. On July 14, 1971, Richard filed a charge of racial discrimination against Gulf Stevedore Corporation and later received a "right to sue" letter from the EEOC on April 27, 1973. From 1951 until 1970, Richard was a regular foreman of a regular general cargo gang at Gulf Stevedores. In 1951, Richard was in an all-black gang with a black foreman and at that time was asked to take over the foreman's job because the former foreman left. Richard alleged that initially

he was treated well, but when the former vice president of the company left, the new vice president and hiring superintendent began to discriminate against him and his gang in work assignments as follows: (1) Richard and his gang got less work; (2) Richard and his gang got more than their share of work in the # 1 hold of ships, the hold where it is more difficult to move cargo, and in a similar but less difficult # 5 hold; (3) Richard and his gang were assigned to load and unload the most unpleasant hand-movable cargo. For reasons that are in dispute, Richard started losing gang members and his accident rate and lost man hours increased. Subsequently, in May 1971, he was discharged as a foreman by Gulf's vice president. Richard alleges that it was racial discrimination against his gang in work assignments that led to his discharge. Defendants assert that Richard's termination was caused by his excessively high accident rate which was the highest of any of Gulf's foremen in terms of cost per man-hour work. This Court finds that it was, in fact, three times higher than the Gulf foreman with the next highest accident rate and was the result of thirteen accidents in his gang during the contract year 1969–70. There followed five more accidents between October 1970 and March 1971. It was the opinion of his superiors that this accident record was attributable to Richard's failure to personally hire his gang at the Center or to stay with them throughout the day. We are not convinced by plaintiff's theory that the type of cargo the gang worked was related to or the cause of the number of accidents. Neither do we agree with plaintiffs that one cannot correlate the amount of earnings of Richard as a foreman with the amount of work his men received because Richard was on a guarantee. Richard's earnings for 1969 and 1970 are higher than the average earnings of all regular foremen at Gulf Stevedores, and if all the other foremen were also on a guarantee, then Richard's gang would have received their fair share of Gulf work during these two years prior to his termination. We conclude that the reason for Richard's

termination was his unacceptable safety record and that he has not carried his burden of proving otherwise, *i. e.*, that it was the result of racial discrimination.

■ John T. Aaron, the other plaintiff-intervenor, a black longshoreman who had worked as a regular on general cargo gangs, worked for Atlantic and Gulf in 1969 and 1970, and for Mid-Gulf Stevedores in 1970, 1971 and part of 1972. In November 1972, Aaron was discharged from the gang by its foreman. Regular gangs at Mid-Gulf were composed of a core of ten men who would always work if the gang was working, an additional three men who would work when a specific type of barge work was available and, lastly, five more men who were "regulars" on the gang only when the gang was at its full complement of eighteen men. This occurred when the general cargo gangs worked LASH vessels (which refers to lighter aboard ship and means there is no heavy physical labor associated with LASH work), which Mid-Gulf serviced exclusively, in addition to other kinds of work that went along with it. Aaron was a regular on the eighteen-man gang only. Therefore, when Aaron was not working on a LASH ship, the only type which he was obligated to work, he would seek longshore work with another foreman. However, Aaron also worked for a construction company. After he was terminated, Aaron filed an EEOC charge in which he alleged that he "was fired from a regular grain crew in which [he] had been employed for over a year, because of [his] race." (Plaintiffs' Exhibit # 44.) Contrary to this allegation, this Court is convinced from the evidence that Aaron was discharged from the gang because of excessive absenteeism. In fact, the evidence indicates that Aaron's foreman complained to Mid-Gulf's general manager about the fact that he had not been available on a regular basis over a long period of time. On investigation, the general manager agreed with Aaron's foreman that Aaron should be dropped from the gang. On November 6, 1972, Aaron was replaced with a black longshoreman. On investigation of the matter by the vice president of Local 1419, it was determined that

Aaron had been absent over 50% of the time he worked for Mid-Gulf. In fact, from April 1972 through October 1972 Aaron worked a total of 775 hours as an iron worker under the jurisdiction of the local Iron Workers Unions. The Court concludes that Aaron's termination was not motivated by racial discrimination and, further, that no other longshoreman in the same gang as Aaron had an absentee record as bad or worse than Aaron's during the critical seven-month period which was considered by those in authority in the decision to terminate Aaron. On the evidence, we are convinced that Aaron failed to prove that his discharge was the result of racial discrimination.

*Class Action*

■ This suit was filed by plaintiffs on behalf of themselves and ". . . all other persons similarly situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure." Plaintiffs then set out, in Paragraph II of their Complaint, requirements of numerosity, the existence of issues of law and fact common to the class, fair and adequate representation by plaintiffs, claims and defenses of defendants typical of those of the class and a situation where defendants have refused to act on certain grounds applicable to plaintiffs and the class. By Minute Entry of January 18, 1972, this Court denied a motion to dismiss the class action filed by NOSA and the defendant employers. Subsequently, defendants filed a motion to dismiss the class action on certain issues, which the Court deferred ruling on until after the trial of the merits of the case, by Minute Entry dated July 18, 1974. Even if we had not done this, as stated in Wright & Miller, *Federal Practice and Procedure: Civil* § 1785, p. 137: "The court's initial decision under Rule 23(c)(1) that an action is maintainable on a class basis in fact may be the final resolution of the question, although it is not irreversible and may be altered or amended at a later date." Of course, the fact that we have held that the named plaintiffs have not proved their own Title

672

VII claim does not mean that the class of employees they seek to represent are deprived of a remedy if it is appropriate. *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974); *Brown v. Gaston County Dyeing Machine Company*, 457 F.2d 1377, 1380 (4th Cir. 1972). However, we are convinced at this point that plaintiffs have not proved that they are entitled to maintain a class action under Rule 23(a) and (b)(2) in that the class lacks the requisite numerosity and, even if that were not the case, plaintiffs have not proved employment discrimination in the specific areas they have delineated which is applicable to a specific group of employees similarly situated and generally acted upon by the defendants with respect to an applicable class.

*Numerosity.* In 1968, fifteen waterfront workers filed charges of racial discrimination with the EEOC against NOSA and some of its members, including fourteen of the remaining fifteen defendant stevedore companies in this suit. These charges attacked a broad range of employment practices alleged to be racially discriminatory. The EEOC consolidated the charges and undertook a year-and-a-half investigation which effectuated conciliation efforts that resulted in a formal Settlement Agreement (NOSA Exhibit # 7), on March 2, 1971. This Agreement obtained general as well as specific commitments from all defendant employers on the issues of nondiscriminatory practices and policies, covering many of the complaints involved in this case. Most differences involve the relief sought and not the substance of the charge. *See*, Minute Entry of January 18, 1972 (Record, Document # 39, p. 6). In addition, it established a reporting and monitoring procedure by the EEOC which would insure future compliance with the Agreement. The Settlement Agreement was ratified and signed by all of the riverfront companies charged with discrimination and by eleven of the charging parties, with the exception of the three plaintiffs in this suit, Williams, Turner and Hayes, and was also approved and executed by the EEOC. This Court is aware that in its Minute Entry of January

18, 1972, *supra*, it held that the Settlement Agreement could have no effect on the right of the individual plaintiffs to bring suit and also that the fact that the signatories to the Agreement constituted the majority of the charging parties did not mean that they were more representative of the class than the instant plaintiffs. However, having heard all of the evidence and having listened to plaintiffs' witnesses, the Court cannot now disregard the fact that eleven out of fourteen complainants were satisfied with their settlement with the defendant companies and plaintiffs have given no proof of any other group sufficiently large to warrant class action. Additionally, although we have not been presented with an actual petition disclaiming class representation by the individual black members of Local 1419, we are aware that the majority of the members of Local 1419 do not wish to be represented as a class in the plaintiffs' efforts to integrate the dual unions. We conclude, as did the trial court in *Bailey v. Ryan Stevedoring Co., Inc.*, 528 F.2d 551, 553 (W.D.La.1976), which involved similar issues in the Port of Baton Rouge, that " '[t]he facts of this case clearly establish that the claims of [the plaintiffs] are individual in nature and the issues raised by them are not issues common to any definable class too numerous to sue individually . . . .' " under Rule 23, F.R.Civ.P. Therefore, since our decision does not have any class application, any other rulings in this decision will have *res judicata* effect only as to the individual plaintiffs. *Roman v. ESB, Inc.*, 550 F.2d 1343, 1355 (4th Cir. 1976).

### Employment Discrimination—Segregated Locals

Plaintiffs assert now, and previously on their motion for separate judgment on the issue of the maintenance of segregated local unions, that the maintenance of a substantially all white union and an all black union has an adverse effect on the employment opportunities of black longshoremen based, of course, on the fact that they outnumber white longshoremen by three to one and are

not so treated. Plaintiffs further assert that even if the Court does not find employment discrimination, that the maintenance of segregated locals is a *per se* violation of Title VII of the Civil Rights Act.

As stated earlier in the Opinion, the areas of racial discrimination have been broken down by plaintiffs into two categories, with subdivisions under each. The first is racial discrimination in preferred work assignments and includes: (1) grain cargo gangs; (2) carpentry work; (3) LASH vessels—Mid-Gulf; (4) assignment of preferred deck jobs. The second is in the selection and assignment of supervisors: (1) general and ship superintendents; (2) foremen, regular and extra, and grain foremen. Before discussing these specific areas, there are two assumptions plaintiffs have made with which this Court is not in agreement. The first has been touched upon, *i. e.*, that each defendant employer is responsible for its own employment practices. If this had always been the plaintiffs' position, the Court would never have considered the members of NOSA an integral unit. However, we did so on the basis that they all followed the same employment practices dictated by NOSA. It is not certain, but in view of our ultimate decision in this area it may not be necessary to resolve this matter. However, if we have to, we think that our view of the industry, as will be set forth, precludes now an attempted showing of employment discrimination by scrutinizing the disparities in black and white employment by fifteen separate employers who purportedly discriminate in a variety of individual ways. The second point is that, with respect to some of plaintiffs' statistics, the figures are based solely on integrated gangs, without regard to gangs which are all black. Since plaintiffs argue that, even when the focus is expanded to include *all* gangs, the results are not changed significantly, we see no reason not to operate on an analysis of *all* regular gangs.

I. *Racial Discrimination in Preferred Work Assignments*

(1) *Grain Cargo Gangs—Longshoremen*

Apparently work in grain cargo is easier and better paying than other general long-shore work, there being a 20 cent per hour premium for such work. Up to and during some of the trial of this suit, the Deep Sea Agreement between NOSA and Unions provided that: "So far as is practical, work is to be divided between members of ILA Locals 1418 and 1419 in grain trimming machine gangs, and/or hand trimming gangs." In practice, this meant that grain crews were to be half white and half black, assuming that sufficient longshoremen of both races were available, even though the active black local membership was more than three times greater than that of the white. Plaintiffs argue that the clause was originally agreed to by the black union because of its concern that its members would receive even less than half of the grain cargo work as a result of discrimination by white foremen. However, according to our reading of the testimony of the President of Local 1419 at that time, Wilfred Daliet, whose testimony plaintiffs rely on, it was his understanding that the foremen, the majority of whom were white, did hire as equal a number of black and white for grain gangs as they could. But it was the former president of 1419 who insisted that the clause be inserted in the Deep Sea Agreement to protect his men and to see to it that they would get a "fair shake." The clause was continued in one form or another down to the current contract year of 1971–1974. However, on the expiration of that contract on September 30, 1974, it was determined that it would not be necessary to continue the grain clause into the next contract because of the strides made by blacks with respect to grain cargo work, including the addition of three black foremen in the grain industry in 1974. (Transcript, pp. 1572–77, Wilfred Dailet.) This is not to say that we disagree with plaintiffs' position that the division of grain cargo work was discriminatory and that it was accomplished through a segregated union system. We also cannot disagree with plaintiffs, on the facts, that the removal of the contract language was a tactic of this litigation and in response to the dictates of Title VII. We

are not prepared, at this point, to say that this suit was not the catalyst for the removal of the clause.

### (2) *Grain Cargo Crews—Waterboys*

In narrowing its areas of discrimination, the plaintiffs next look at the allocation of grain waterboy work, as opposed to blacks employed as regular waterboys. They first point out that there is nothing in the waterboy contract concerning the allocation of grain waterboy work between members of the white and black locals as existed in the Deep Sea Agreement as to grain cargo crews. In spite of this, it seems to the Court that there must have been some impact from the 50-50 grain work division since, as previously described, there is not one waterboy for each gang. In addition, we think that this subdivision is just too insignificant in terms of the entire waterfront workforce to give much weight to plaintiffs' case. We prefer to look at the overall picture of waterboys at defendant companies. The evidence indicates the following for individual company defendants, the basis on which plaintiffs want to operate: during 1973, Cooper Stevedoring had two regular waterboys, one black earning $17,517 and one white earning $8,997; for the same period, Strachan Shipping had four regular waterboys, two blacks, one earning $19,614 and one $11,870, and two whites, one earning $8,915 and one earning $8,654; for the same year, J. Young & Company employed three waterboys, one black and two white, the black man earning more than either of the two whites; for the year, J. P. Florio employed three waterboys, one black who earned $10,641, one white who earned $7,841 and one white who earned $4,794; finally, for that year, Gulf Stevedores, employed two regular waterboys, one white who earned $4,849 and one black who earned $5,897. In addition to what the foregoing could indicate, that less blacks are working more hours than whites as regular waterboys, NOSA Exhibit # 24 shows that the regular waterboys used by defendant companies has been declining over the past years. In 1972 there were 29 black and 48 white, and in 1973 there were 27 black and 38 white, which indicates a substantially greater decrease of whites over the small decrease of blacks. Moreover, on an average basis during 1972 and 1973, earnings of regular waterboys were approximately the same for blacks and whites.

### (3) *Carpentry Work*

█ Plaintiffs next focus on what they allege to be a pattern or practice of racial discrimination in the hiring of longshoremen to work in carpentry gangs. Carpentry work is used in connection with loading and unloading older ships in which supporting walls are constructed to hold cargo and also in the securing and lashing of cargo aboard vessels. It is uncontested that the use of carpenters has diminished in recent years and that in the past, defendant companies had traditionally assigned most carpentry work to whites. As a corollary, men working as members of the few remaining carpentry gangs all have very long employment records, many of which predate the effective date of the Civil Rights Act of 1964. Furthermore, there have been few additional openings in regular gangs due to the foregoing. The combination of seniority of long standing coupled with a decrease in the type of work does not lend itself to a finding of discrimination in hiring of black carpenters.

### (4) *LASH Vessels*

The nature of LASH vessel work has previously been described. Defendants have shown that 83.7% of all LASH/seabee and container gangs employed by defendant employers is black, hardly indicative of racial discrimination. Plaintiffs, however, have focused solely on defendant Mid-Gulf which, as earlier pointed out, exclusively services LASH vessels. Plaintiffs assert that there was an agreement between the two locals and Mid-Gulf as to the division of LASH work between the two locals. However, as the Court appreciates the evidence, Mid-Gulf was instructed by Local 1418 and Local 1419 to divide the work up on a 40-60 basis, respectively, between the two and Mid-Gulf complied with these instructions

for about a year and a half, starting in 1968. The underlying reason for this was that both unions went on strike over the number of whites and blacks who would work LASH gangs, as it was obvious that LASH vessels would not require as many longshoremen as the previous types of vessels. In 1971, Mid-Gulf advised the two unions that it would no longer apply this requested ratio and, at the time of trial, according to the testimony of the general manager of Mid-Gulf, the ratio of their gangs was about 72–28 or 75–25. The evidence further indicates that among five of the major defendant companies, Lykes Brothers, Mid-Gulf, J. Young, Atlantic & Gulf, T. Smith & Son, in the year 1972, the racial composition of LASH, seabee and container gangs was a total of 326 blacks and 61 whites for a percentage of 84.23 black and 15.76 white. In 1973, it was 405 blacks and 81 whites, a percentage of 83.7 black and 16.3 white. This also does not present a picture of racial discrimination in our view.

### (5) *Deck Jobs in General Cargo Crews*

■ A general cargo crew is made up of sixteen members, of which eight men work in the ship's hold and the balance work on deck—at jobs such as derricksmen, pilemen, hook-on men, driver and winchmen. Deck jobs pay no higher than those in the hold, but they are considered preferable to the hold jobs in that they are less physically demanding. Plaintiffs contend that the twelve defendant companies that employ regular general cargo gangs discriminate against blacks in connection with assignment to preferred deck jobs. Once again, plaintiffs talk in terms of the number of blacks on the waterfront rather than the percentage of blacks holding these "preferred" jobs. The following is their statistical analysis:

Proportion of White and Black Members of All General Cargo Gangs
Assigned to Deck Jobs, December 1973

|  | Number in all Regular General Cargo Gangs | Number in Deck Jobs | % in Deck Jobs |
|---|---|---|---|
| White | 188 | 162 | 86.2% |
| Black | 1,242 | 542 | 43.6% |

However, if one looks at the overall picture presented by the major defendant companies during a five-year period, the view is not as bleak:

Number of Regular Gang Members by Race
In Deck and Wharf Jobs in Regular Company Gangs

| Company | Gang Position | March 1965 | | March 1970 | |
|---|---|---|---|---|---|
|  | Winchmen, Derricksmen, Hook-on Men, Lift Operators, Pile Men | White | Black | White | Black |
| Atlantic & Gulf | " | 31 | 57 | 53 | 106 |
| Gulf | " | 21 | 19 | 9 | 39 |
| Louisiana Stevedores | " | 21 | 27 | 24 | 44 |
| N. O. Stevedoring | " | 109 | 59 | 76 | 92 |
| Florio | " | 32 | 40 | 30 | 32 |
| Lykes Bros. | " | 64 | 61 | 39 | 72 |
| Strachan Shipping | " | 27 | 53 | 20 | 60 |
| T. Smith & Son | " | 84 | 189 | 52 | 214 |
| Ryan Stevedoring | " | 66 | 46 | 17 | 37 |

This table indicates a definite trend of a steady movement of black longshoremen into "preferred work" of deck and wharf jobs and, as the evidence shows, on the basis

of gang longevity and individual ability to perform the work.

## II. *Racial Discrimination in the Selection and Assignment of Supervisors*

### *Superintendents and Foremen*

The superintendents constitute the level of supervision above foremen and their gangs. They hire the necessary foremen and their gangs each day and assign them to a particular ship. They are regular salaried company employees. The plaintiffs minimize the situation when they state that some overly industrious longshoremen and foremen make more money than superintendents, but that the latter's job has the advantages of regularity of income, status and authority. Plaintiffs assert that ten of the defendant companies discriminate in the hiring of superintendents in that none of the companies has ever hired more than one black superintendent and only three had a black superintendent at the time of trial. There was evidence that a number of black foremen have been offered and refused jobs as superintendents since 1968. However, a comparison of 1973 average earnings of men who became superintendents since 1968 to the 1973 average of these black foremen indicates an average of $14,544.48 for superintendents to an average of $23,178.56 for foremen. Apparently, there is a greater desire to work for a larger amount of money than regularity of income, status and authority. Plaintiffs presented no evidence to rebut this conclusion.

With respect to foremen, plaintiffs contend that defendants Atlantic & Gulf, Dixie, J. P. Florio, Louisiana Stevedores, Lykes, Mid-Gulf, T. Smith and J. Young discriminate in the hiring of regular foremen. This is based on the fact that although the pool of longshoremen from which the regular foremen are selected is over 75% black, as of July 1974 blacks constituted 50% or less of the regular foremen of these companies. First, we reiterate that we are more interested in the trend in hiring of regular foremen in the entire industry as indicating whether there is a continuing pattern or practice of discrimination. The evidence indicates that the number of regular foremen by race of defendant companies in 1972 was 50 black and 93 white, in 1973 there were 62 black and 91 white and in 1974 there were 68 black and 88 white. This indicates a constant increase in black foremen and a decrease in white. Earnings have also improved with black foremen earning an average of $11,575.44 in 1972 as compared to a white average earning in that same year of $12,225.27. In 1973, the evidence indicates that black foremen earned an average of $14,975.25 to a white average earnings of $13,527.61. (NOSA Exhibits 84 and 85.) Additionally, as of June 1974, 50 blacks and 42 whites had become regular foremen with their companies since 1968. (NOSA Exhibit # 89.) Once again, this indicates a discernable improvement for blacks and, from raw data, it is impossible to gauge the effect of seniority on this situation. The most encouraging thing is that blacks have been steadily increasing their proportionate share of regular foreman positions.

Plaintiffs also point to a number of companies that discriminate in the hiring of extra or non-regular foremen. These men are hired by a company when there is more work than can be done by the company's regular foremen and gangs. The list of these companies includes seven of the eight charged with discrimination in the hiring of regular foremen, with Dixie not being included, but adds three other companies to the list that discriminate in hiring non-regular foremen, Gulf, New Orleans Stevedores and Ryan. We agree with the defendants that there is no logic to the contention that some companies do not discriminate in the hiring of regular foremen, the more desirable job, but do discriminate in the hiring of non-regular foremen. And, furthermore, in most cases this discrimination is done by the same stevedore superintendent. We reject this aspect of plaintiffs' case out of hand.

The Court is aware of the fact that it is " . . . well established that courts must . . . examine statistics,

patterns, practices and general policies to ascertain whether racial discrimination exists" in a particular industry under court scrutiny. *Brown v. Gaston County Dyeing Machine Company*, 457 F.2d 1377, 1382 (4th Cir. 1972), *citing United States v. Jacksonville Terminal Co.*, 451 F.2d 418, 442 (5th Cir. 1971). However, when relying on statistics to make out a *prima facie* case for the plaintiffs, courts look for a large statistical imbalance plus a strong factual background of discrimination. *Roman v. ESB, Inc.*, 550 F.2d 1343, 1353 (4th Cir. 1976). We do not think that the disparities in the statistical analysis presented by the plaintiffs is sufficient to serve as the basis for a conclusion that racial discrimination is being practiced. We think that there are too many variables in the longshore industry as constituted in the Port of New Orleans which are not encompassed by statistics. These have been pointed out by the unions as including (1) the nature of the work, in that individual employees are not compelled to work every day and many can earn a decent living by working premium hours only when they want to; (2) even those who do work regularly can achieve maximum earnings and work hours by a willingness to work additional hours to earn premium pay; (3) a certain amount of skill at working certain cargoes or performing certain tasks is subjectively taken into account by superintendents when hiring foremen and their gangs; (4) it is difficult to calculate the effect of the large number of casuals who drift into and out of work on the waterfront on racial distribution of work. It appears to the Court that NOSA and its member companies are willing and actively working at complying with Title VII, as indicated by the terms of the Settlement Agreement entered into, and also that there is a trend in job improvement of blacks in the longshore industry. At this point, we can find no broad pattern or practice of racial discrimination. *See Bailey v. Ryan Stevedoring Co., Inc.*, 528 F.2d 551 (5th Cir. 1976).

III. *Segregated Locals*

In spite of all that we have just said, the Court does not intend to give the impression that there is no more room for improvement of the black longshoreman's position in the Port or to minimize the effect of this suit or its importance. If nothing else, as we have previously indicated, it may well have been responsible for a change in the allocation of grain work and the elimination of the 50–50 practice previously in practice. More importantly, it has brought to issue the question of whether two separate unions, one predominately for black longshoremen and one for white longshoremen, should exist in the Port of New Orleans. Section 703(c)(2) of the 1964 Civil Rights Act states: "It shall be an unlawful employment practice for a labor organization . . . to limit, segregate, or classify its membership or applicants for membership . . . in any way which would deprive or tend to deprive any individual of employment opportunities . . . because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e–2(c)(2).

Locals 1418 and 1419 are jointly certified by the National Labor Relations Board as the collective bargaining representatives of longshoremen on the New Orleans waterfront. They represent two locals with identical jurisdiction which appear to have no other purpose for existence than the segregation of the black and white races. The segregated locals are chartered by defendant I.L.A. Locals 1802 and 1683 also are jointly certified by the National Labor Relations Board as the collective bargaining representative of sacksewers, sweepers, waterboys and coopers on the New Orleans waterfront. Here, too, there are two locals with the same jurisdiction, once again the only difference being that the locals are segregated on the basis of race. These two locals are also chartered by defendant I.L.A. As pointed out by the plaintiffs, the International Longshoremen's Association is the only major union in the United States that has not voluntarily undertaken to disestablish racially segregated unions within its jurisdiction. The relevant cases where this condition has been remedied by the

courts are *United States v. International Longshoremen's Association*, 460 F.2d 497 (4th Cir. 1972), the Port of Baltimore; *EEOC v. International Longshoremen's Association*, 511 F.2d 273 (5th Cir. 1975), the Port of Texas; *Bailey v. Ryan Stevedoring Co., supra*, the Port of Baton Rouge.

In the face of strong opposition from both locals to merger and also to this Court's finding that plaintiffs have not proved present discrimination, we are now faced with the problem of deciding at this stage of the proceedings whether Locals 1418 and 1419 should be required to merge and whether Locals 1802 and 1683 should also be required to merge. The Court is of the opinion that it should so require the merger, either because these racially segregated unions are in violation of 42 U.S.C. § 2000e–2(c)(2) in that they "tend" to deprive individuals of employment opportunities or because segregated locals are a *per se* violation of the Act under the language quoted above. Even though the grain clause has been deleted from the current Deep Sea Agreement, we think that it is just one of several examples presented by this case as to how the existence of two segregated unions can tend to deprive individuals of work because of the tendency of this situation to fragmentize the industry on the waterfront. As long as to the two separate unions exist in each case, another situation can arise where it is felt desirable to "keep things even," half for one union and half for the other. Even the 75%–25% ratio which appears to have emerged has the effect of dividing work according to race because the unions are segregated. When two unions share work there is ordinarily no problem. However, when the unions are substantially segregated, *any* allocation of work between them necessarily involves a division of work according to race—because race forms the basis for membership in the union. The division of the LASH work is yet another example of how these two unions are a ready-made division for splitting work, even though the division is not done on a per-employee basis and, therefore, not necessarily equitable as far as the individual workers are concerned.

A third situation exists. The Deep Sea Agreement establishes three management-labor committees to administer the contract. Under its Article XIV, dealing with "Working Regulations," it establishes a Methods Committee which has the authority to approve changes in the working procedures on the waterfront as established by the contract. Article XVII, which prohibits strikes and mandates arbitration of disputes, establishes a permanent Disputes Committee which constitutes the second step of the procedure for the resolution of all disputes involving the interpretation or application of the Agreement. Article XXIII establishes a management-labor committee to police abuses of the Guaranteed Annual Income Plan. By the terms of this contract, each of these committees is made up of four members, two from the Association and *one* from each local. Here is yet another example where each union is treated as being equal. Defendants argue that none of the committees have either met or taken any action which could have had any effect on either union. We find this immaterial, as we do the fact that the grain clause has been deleted and that Mid-Gulf no longer enforces the requested LASH/vessel work quota. In the *Bailey* case, the court pointed out, *supra* at 556, that the hiring of longshoremen of the segregated locals on the basis of a 50%–50% rule was a practice which had "discriminatory potential." Even though the district court had found that for the last nine years the membership of the two locals had been quite comparable, *Bailey v. Ryan Stevedoring Co.*, 7 EPD ¶ 9424 at p. 7869 (M.D.La. 1974), the Fifth Circuit found that the 50%–50% hiring practice represented a threat of employment discrimination that violated 42 U.S.C. § 2000e–2(c)(2). We think that our situation is analogous to the *Bailey* case since the tendency exists for discrimination in both cases based on past situations, even though under the present situation in both cases no real harm is presently experienced.

However, there is one difference between the present case and *Bailey*. In *Bailey*, the

Fifth Circuit Court of Appeals found that the 50%–50% division was a practice which was discriminatory. There is no practice still in effect which has been demonstrated to this Court to be discriminatory at this time. However, even if we are incorrect in concluding that some former discriminatory practices, involving the division of work between the unions which were in effect until recently, still have the tendency to create a potential for discrimination, then we find that maintenance of Locals 1418 and 1419 and maintenance of Locals 1802 and 1683 are *per se* violations of Title VII.

Before going into the question of the uncertainty of the law in the Fifth Circuit, we note that two other circuits have held that segregated locals are *per se* unlawful. See, *United States v. International Longshoremen's Association, supra; Evans v. Sheraton Park Hotel,* 164 U.S.App.D.C. 86, 503 F.2d 177 (1974). There is no such direct holding from the Fifth Circuit, although there is no contrary holding. In *United States v. Jacksonville Terminal Company, supra,* the court, after determining that plaintiffs had proven that the defendants had committed specific acts and practices of racial discrimination in employment since the July 2, 1965, effective date of the Civil Rights Act, turned its attention to the fact that two segregated locals existed as separate entities with respect to Terminal work. The court concluded that, in view of the racial discrimination which had been proved in light of the total employment picture, "[t]he record clearly discloses that the existence of 'separate but equal' locals has had, and may continue to have, post-Act deleterious effects on blacks." Consequently, the court found a direct violation of 42 U.S.C. § 2000e–2(c). Subsequent to the *Jacksonville Terminal* case, the Fifth Circuit again faced the question of the legality of maintaining segregated black and white unions. *EEOC v. International Long. Ass'n,* 511 F.2d 273 (5th Cir. 1975). In this case, the main holding appears to be that since it was shown that the segregated locals had had actual discriminatory effect on employment opportunities, merger of them was mandatory. (451 F.2d at 457.) Although one of

the judges of the three-judge court, Judge Goldberg, attempted to find a *per se* violation, Judges Thornberry and Godbold did not feel the need to and in their concurring opinion stated at p. 280: "If a case ever comes to us with a finding by the district court that no actual employment discrimination arose from segregated locals, we may then properly consider the necessity for a rule of *per se* illegality." It is this language which gives us pause and brings us into a consideration of the issue of *per se* illegality. We view our case as one where employment discrimination arose once and could, in the future, arise from segregated locals but it has not been demonstrated that it presently exists. After the *International Longshoremen's Association* case, the Fifth Circuit decided *Local No. 293, etc. v. Local No. 293–A,* 526 F.2d 316, 317 (5th Cir. 1976). The plaintiffs in this case alleged that the defendant local had discriminated against them on the grounds of race, for which relief was sought, and, in addition to this, plaintiffs raised the issue of the merger of segregated unions. The district court, without an evidentiary hearing and on the sole basis of the record, ordered merger of the two unions, reserving ruling on the damage claim until after a trial on the merits. The case was appealed to the Fifth Circuit on the issue of whether Title VII was applicable to the defendant local. The Fifth Circuit reversed on the basis that the district court was in error in denying the motion of defendant to dismiss for lack of jurisdiction. After this conclusion, the court in *Local 293 v. Local 293–A, supra* at 319, stated as dictum in a footnote that although the district court found no actual discriminatory effect on employment opportunity, "[s]hould jurisdiction subsequently be found . . . the plaintiffs must demonstrate such discriminatory effects." Although this language is stated to refer to the fact that the court pretermitted a decision on the validity of the lower court's grant of partial summary judgment on this issue of segregated unions, we are not convinced that the footnote statement resolves the issue at hand. In the later case of

*Bailey v. Ryan Stevedoring Co., Inc., supra,* as noted by plaintiffs, the Court of Appeals cited the *Local 293* decision, but stated, as previously referred to, that the *per se* issue had not been decided by the court yet. Furthermore, following the three-judge court decision in *Bailey,* a poll of the entire court was taken on the ILA's petition for rehearing *en banc.* This petition was denied, *Bailey v. Ryan Stevedoring Company, Inc.,* 533 F.2d 976 (5th Cir. 1976), by a vote of 13 to 1. Judge Clark, as the lone dissenter, argued that, in light of the district court's uncontradicted finding that there had been no discriminatory effects, the panel's reliance on "future contingencies" was wrong. He "[construed] the panel opinion to override the vital associational rights involved in this case *on the basis of legal deductions* that are contrary to the facts and to valid prior precedent in this circuit." (Emphasis added.) *Supra* at 976. We agree with plaintiffs that it appears that Judge Clark, himself, concluded that the panel's reliance on "future contingencies" amounted to a rule of *per se* illegality.

Judge Clark also stated in the panel consideration of *Bailey, supra* at 977, that the appellate court had mandated the district judge "to grant Bailey's motion to force the merger of two independent union locals who do not want to merge." The two locals in our case also do not want to merge. Nor did the locals wish to merge in *United States v. Jacksonville Terminal Company, supra,* or in *EEOC v. International Long. Ass'n, supra.* In the opinion of the lower court in the latter case, *United States v. International Longshoremen's Ass'n,* 334 F.Supp. 976, 978 (S.D.Tex.1971), the district court pointed out that black union officials urged the court not to order merger, insisting that ". . . the negroes, by having their own unions and their own union officials, have been able to better themselves by being able to hold high positions in their locals, and have been recognized in the community as a separate, powerful voice for the Negro communities, and has attained for them and the Negro people of the Community, a standing which they could not have otherwise attained." The Defendant Local

1419 argues, along the same lines in the instant case, that it is larger, wealthier and better manned than Local 1418, better services its members' needs than Local 1418, provides substantial benefits which the latter does not and cannot provide and is free from substantial debt, unlike 1418. In the words of Local 1419's attorneys:

> Over the years, Local 1419 has regarded itself, and has been regarded by others, as a special spokesman and leader of the black community both on the waterfront and in economic, social and political affairs generally. It has used its resources and the energies of its officers and members to promote a wide variety of black educational, social and political programs in an effort to improve the lot of the black community. Local 1419 is a potent force on behalf of blacks in New Orleans and Louisiana.

By our decision, we do not mean to imply that the foregoing attitude is not a noble endeavor, but we doubt that it is one which ought to be pursued under the direct auspices of a labor union. Other courts have recognized the validity of the anti-merger position but have rejected this argument against merger. In *United States v. International Longshoremen's Ass'n, supra* at 978, the district court countered that ". . . the ultimate issue before the Court is whether this pattern or practice of having segregated locals is keeping longshoremen, be they Black or White, from equal working opportunities on account of a longshoreman's race or national origin." And the Fifth Circuit countered in the *Jacksonville Terminal* case, *supra* at 457 that:

> Contrary to the allegations made by the Unions, we find that their locals are not mere "social clubs," having no influence in national union policy or practice. We conclude that the District Court erred in refusing to hold that the failure to consolidate the locals violates section 703(c) of the Act, 42 U.S.C.A. § 2000e–2(c).

The effect of dual unions is described by both Judge Goldberg, in *Bailey,* 451 F.2d at 457, and by the Fourth Circuit in *United*

*States v. International Longshoremen's Association, supra* at 500, to the effect that representatives of separate unions charged with only serving that union cannot be realistically expected to act strongly on behalf of the other union and, consequently, both conclude that agreements between labor and management emerging from bargaining by one union on behalf of all longshoremen rather than one charged with serving white employees and the other with serving black employees will better the employment status of all employees. For this reason, this Court concludes that each of the two locals should be merged.

The foregoing represents this Court's findings of fact and conclusions of law in this case. Let judgment be entered accordingly.